JAMES R. HOLT, Respondent, *v.* W. J. SIMMONS ET AL.; A. JUDLIN, Appellant.

### June 24, 1884.

1. PARTNERSHIP — EQUITY. — A proceeding for the settlement of partnership affairs between the copartners and between the firm and its creditors is a proceeding in equity.

2. —— REFEREES — PRACTICE. — The findings of fact of a referee upon the claims of firm creditors in a partnership settlement proceeding are subject to review, both by the trial court and by the appellate court.

3. —— TRADING FIRMS — IMPLIED POWERS — COMMERCIAL PAPER. — A manufacturing partnership firm which buys and sells is a trading firm, and

one partner has the implied power to borrow money on the firm credit and to issue commercial paper therefor, in the firm name.

4. —— He who has knowledge that one partner has executed a firm note with the consent of his copartner may assume that such partner has the power to execute and negotiate commercial paper in the firm name.

5. —— NOTICE. — Commercial paper issued for value in the firm name, after the firm's dissolution, by one party without the other's consent, is good, in the hands of the payee who had no notice, actual or constructive, of such dissolution.

6. —— MORTGAGE — PLEDGE. — In the absence of fraud of the mortgagee or pledgee a partner may bind the partnership by the pledge or mortgage of firm personalty for business purposes of the firm and within the scope of the partnership business.

7. —— AGENCY. — In pledging or mortgaging firm personalty, for firm purposes and within the scope of the business by one partner, he is presumed to act as the agent of his copartner with respect of the latter's share or interest.

APPEAL from the St. Louis Circuit Court, LINDLEY, J. .
*Reversed and remanded with directions.*

DYER, LEE & ELLIS, for the appellant: It is a legal consequence in every commercial partnership — every partnership engaged in buying, selling or exchanging, that each partner is the general agent of the firm ; and has power to act for it and bind it in all matters within the scope of the partnership business, and it is within the scope of such business to borrow money, to draw money, accept, or indorse bills of exchange or promissory notes. These are the means of conducting such business, and they are common alike to all partnerships engaged in the sale of merchandise. — *Wagner* v. *Simmons,* 61 Ala. 146 ; *Howze* v. *Patterson,* 53 Ala. 205 ; *Pohlman* v. *Taylor,* 75 Ill. 629 ; *Zuel* v. *Bowen,* 78 Ill. 324 ; *Johnson* v. *Barry,* 95 Ill. 483 ; *Leffer* v. *Rice,* 44 Ind. 103 ; *Faler* v. *Jordan,* 44 Miss. 283 ; *Porter* v. *White,* 39 Ind. 613 ; *Hoskinson* v. *Elliott,* 62 Pa. St. 393 ; *Roney* v. *Buckland,* 4 Nev. 45 ; *Ford* v. *McBride,* 45 Texas, 498 ; *Smith* v. *Collins,* 115 Mass. 388 ; *Dowe* v. *Moore,* 47 N. H. 419 ; *Silverman* v. *Chase,* 90 Ill. 37 ; *Wells* v. *Miller,* 66 N. Y. 255 ; *Ditts* v. *Lonsdale,*

44 Ind. 521; *Johl* v. *Fernberger*, 10 Heisk. 37; 1 Am. Ld. Cas. 442; *Hunt* v. *Clarke*, 56 Ala. 19. The implied authority of a partner having power to borrow money to pledge the personal property of the firm for money borrowed is beyond dispute. — 1 Lindley on Part. 285, and cases cited. One partner has power without any special authorization for that purpose to execute a mortgage on the personal property of the partnership to secure all partnership debt. — *Keck* v. *Fisher*, 58 Mo. 532; *Flanagan* v. *Alexander*, 50 Mo. 50. A trading copartnership is one in which the business thereof, according to the usual mode of conducting it, imports in in its nature the necessity of buying and selling; and such a copartnership is invested with all the powers and subject to all the obligations incident to a trading partnership. — *Kimbro* v. *Bullitt et al.*, 22 How. (U. S.) 256; *Mc-Gregor* v. *Cleveland*, 5 Wend. 475; *Winship Bank* v. *U. S.*, 5 Pet. 529; *Baker* v. *Wheeler*, 8 Wend. 505; *Coles* v. *Coles*, 15 Johns. 160; *Johnson* v. *Dutton*, 27 Ala. 245; *Hedley* v. *Bainbridge*, 3 Q. B. 321; *Cagill* v. *Cosby*, 15 Miss. 425.

A. MOORE BERRY, CHAS. B. STARK and THOS. METCALFE, for the respondent: Persons who, with knowledge of the character and scope of a partnership business, deal with one partner, do so with notice of the limitations which the nature and customs of that business place upon the power of each partner to bind the firm. — Pars. on Part. 99; *Pooley* v. *Whitmore*, 10 Heisk. 638. Persons who deal with a partner are bound to know the extent of his authority. — *Davis* v. *Richardson*, 45 Mo. 510; *Waller* v. *Keys*, 6 Vt. 257; *Prince* v. *Crawford*, 50 Miss. 358; *Cocke* v. *Bank*, 3 Ala. 180. The power of one partner to bind his copartner by the execution, in the firm name, of negotiable paper, is confined strictly to trading or commercial partnership. — *Davis* v. *Richardson*, 45 Miss. 508; *Smith* v. *Sloan*, 37 Wis. 285; *Prince* v. *Crawford*, 50 Miss. 344; *Hunt* v.

*Chapin*, 6 Lans. 139; *Gray* v. *Ward*, 18 Ill. 33; *Deardorf* v. *Thacher*, 78 Mo. 128 (advance sheet); *Third National Bank* v. *Snyder*, 10 Mo. App. 211; *Graves* v. *Kellenberger*, 51 Ind. 66; *Cocke* v. *Bank*, 3 Ala. 178; *Judge* v. *Braswell*, 13 Ky. (Bush) 75; *Hedley* v. *Bainbridge*, 3 Ad. & El. (N. s.) *321; Story on Part., sect. 102a; Pars. on Con. 208. Neither partner in a non-trading firm has any implied power to bind his copartner by negotiable notes signed in the firm name. — *Third National Bank* v. *Snyder*, 10 Mo. App. 211, and authorities cited; *Deardorf* v. *Thacher*, 78 Mo. 128. To constitue a custom or usage of a firm, both partners must be cognizant of the course of dealing; the habit of one partner to execute or indorse negotiable paper is not, of itself, sufficient to bind the copartners on the ground that such was the custom or usage of the firm. — *Andrews* v. *Bank*, 7 Smed. & M. 192–196; *Prince* v. *Crawford*, 50 Miss. 359. The mere fact that the money borrowed by one partner has been in good faith applied to partnership purposes is not sufficient to render the firm liable to repay it if there was no actual or implied authority to borrow, and there has been no ratification of the loan. — Collier on Part. 666, citing *Galway* v. *Matthews*, 10 East, 264; *Bannister* v. *Morris*, 6 Exch. 796; *Picketts* v. *Bennett*, 4 C. B. 686; *Hawtayne* v. *Bourne*, 7 M. & W. 595.

THOMPSON, J., delivered the opinion of the court.

This is a suit brought by one partner against his copartners and the firm creditors for the purpose of winding up the concern. There was an injunction, which was afterwards dissolved except as to defendant Simmons, who was the plaintiff's copartner. By consent of parties a referee was appointed " to take proof, audit and allow or reject all claims of the defendants and all others," against the firm, and to " adjust the partnership accounts as between plaintiff and defendant Simmons, partners in said late firm."

The referee heard the parties and filed an elaborate report, stating certain general conclusions of fact and of law, and then passed specifically upon each claim.

The only question which arises upon this record relates to the claim of the defendant Asbury Judlin, upon a promissory note for $400, which, together with two other notes held by the defendant Delehanty, had been secured by a chattel mortgage of all the tangible assets of the firm. The plaintiff Holt resisted the allowance of this claim, on the ground that the note and the mortgage securing it had been given by his copartner, the defendant Simmons, after the dissolution of the partnership, without the plaintiff's knowledge, consent, or authority, express or implied. The referee found that this defence had been made out and rejected the claim, including the mortgage, which of course fell with the note.

The referee based his conclusion upon certain findings of fact, which will be set out. The plaintiff argues that, in respect of this claim, the case is to be deemed an action at law, and that the findings of the referee are therefore conclusive, there being substantial evidence to support them. We do not understand that this is an action at law. We understand that this is a well recognized proceeding in equity, known in the English chancery practice as a " winding up bill," the general purpose of which is to wind up and settle affairs of an insolvent partnership, not only as between the firm and its creditors, but as between the partners *inter se;* that, according to the English chancery practice, those having claims against the firm intervene *pro interesse suo* before a master, who hears proof and passes upon their claims, his findings being subject to review by the court upon exceptions, both as to law and fact. By anology to this practice, the claims in this case were sent to a referee; and we understand that, upon exception to his conclusions of fact, the court will re-examine the same upon the testimony reported by him, just as in the corre-

sponding proceeding in chancery, and overrule his findings, if contrary to a clear preponderance of evidence.

With this understanding of the practice we have looked carefully through the record and have come to the conclusion that the following findings of the referee are well supported by the evidence : That the plaintiff and the defendant Simmons became partners in business on the 28th of October, 1879, under the firm name and style of the Simmons Refrigerator Company ; that their agreement of copartnership was in writing ; that it expired by limitation on the 28th of October, 1880, and that they ceased to be partners on that day ; that the business conducted by them as copartners was the manufacture and sale of refrigerators, ice boxes or coolers, and butcher boxes, and the fitting up of saloons with counters, shelving, sinks, and perhaps some other appliances used in saloons; that the nature, scope, and character of the business thus conducted by them as copartners was known to the defendant Judlin, at or before the time when the debt was contracted, which forms the basis of his claim ; that Simmons contributed to the capital of the concern a lot of stock, manufactured goods, contracts for work, and also his personal services and skill, and that Holt contributed cash from time to time amounting in the aggregate to more than $3,000 ; that Simmons assumed the active management of the business, and that Holt became the office man and book-keeper of the concern ; that on or about October 28, 1880, the date at which the partnership expired by limitation, the firm closed its office and sales-room at No. 1222 Olive Street, where the firm name had hitherto appeared on the window and on the sign over the door, and removed all its stock to a place on Twelfth Street, about two or three blocks further over, which place had been used as a factory by them, but which had no sign to indicate to the public by whom, or what business was done there ; that after this removal to the place on Twelfth Street, the stock was stored away at such place, a room was then

fitted up with a stove and office desk, and that some material on hand, which otherwise would have been valueless and lost, was worked up into two or three ice-boxes, which work occupied about the first three weeks of November, 1880, and was the last work done by the firm ; that at this time the stock on hand belonging to the firm was worth about $1,800, and the indebtedness of the firm, exclusive of claims which are contested by the plaintiff Holt, amounted to about $250 or $300 ; that during the months of November and December, 1880, and January, 1881, Simmons employed men and did some work at this place on Twelfth Street on his own account, of a character similar to the work which had been done by the firm; that neither at the dissolution of the copartnership on the 28th of October, 1880, nor afterwards, was any public notice of that fact given by publication or otherwise, except by closing the office and sales-room of the firm on Olive Street, which had been their usual place of business; that the defendant and claimant Judlin had dealt with the firm before its dissolution, but had no special or personal notice of its dissolution at or before the time when he executed the note which is the foundation of his claim.

As to the nature of the claim of the defendant Judlin, the following findings of fact were made by the referee, which we are of opinion were well supported by the evidence :   That the claim of this defendant consists of a note purporting to have been made by the said partnership firm, the Simmons Refrigerator Company, on the 29th of January, 1881, payable to the order of this claimant, for the sum of $400; that it was executed by Simmons in the firm name after the dissolution of the firm and without the knowledge or consent of Holt; that it was given in lieu of another note for the same amount, payable to the order of the same claimant, dated January 5, 1881, which last named note had also been executed by Simmons in the firm name without the knowledge or consent of Holt ; that the note of

January 29, 1881, as well as that of January 5, 1881, was given to this claimant as collateral security for a note for the same amount dated January 5, 1881, payable ninety days after date, executed by this claimant in favor of the Simmons Refrigerator Company, and delivered to Simmons, who indorsed the firm name thereon and procured it to be discounted, realizing therefor the sum of $400 less the usual bank discount; that this note, executed by the claimant in favor of the Simmons Refrigerator Company, was given to him by the claimant for the purpose of enabling him to raise money, and not for any debt owing from the claimant to the partnership; that when this note fell due it was paid by the claimant, and that the claimant has never been repaid the amount which was thus loaned to Simmons in the name and on the credit of the firm; that the negotiation of this loan by Simmons in the name of the firm by means of getting the claimant's note was done without the knowledge or consent of Holt, who first learned of the transaction and of the giving of the firm note which is the basis of this claim and of the mortgage securing the same at or about the time this suit was commenced; that neither the negotiation of this loan in the firm name, nor the execution of the note which is the basis of this claim therefor, has ever been in any way ratified or confirmed by Holt.

Upon the question whether the money thus raised by Simmons was used by him in payment of debts due by the firm, or whether it was appropriated by him to his own private purpose, there is a sharp conflict of testimony between him and the plaintiff Holt. The referee finds that there is a preponderance of testimony in favor of the conclusion that the money was not used in the course of the business of the firm. We think that we can not interfere with this finding. The conduct of Simmons in the transactions and other matters which were disclosed on his cross-examination impress us with the belief that he is not a creditable witness; while there is nothing in the record to create such

an impression concerning the testimony of Holt. We accordingly hold that the referee was right in finding in favor of the facts stated by Holt, that none of this money was used for the firm. The fact is, the whole transaction was concealed from Holt by Simmons and Judlin said nothing to him about it, although Judlin had met Holt more than once thereafter, for more than a month, and this, notwithstanding a chattel mortgage of the entire stock of the partnership had been executed by Simmons in the name of the firm, to secure this note and two other notes in favor of the defendant Delehanty, amounting in the aggregate to $662.

The propriety of the conclusion of the referee that this claim ought to be rejected will depend upon the soundness of other conclusions of fact and of law, upon all of which the referee made distinct findings. One of these was that neither of these partners had express authority to bind the firm by the borrowing of money and the issuing of negotiable paper. Of this there is no question. Another is that there was no evidence before the referee in respect of any usage or custom of similar copartnerships as to borrowing money or executing or negotiating notes and bills. This conclusion is equally unquestioned. No such evidence was offered. A third is, that in order to carry on the business of the firm in the usual and ordinary way, there was no necessity, either of borrowing money or of negotiating notes and bills. In view of other findings of the referee, we think that this last conclusion may be doubted. The referee has found, upon undoubted testimony, that the firm did on several other occasions borrow money and issue negotiable notes; that on May 12, 1880, Simmons having first obtained the consent of Holt, procured four notes which had been made payable to the firm to be discounted, realizing for the firm the sum of $287.50. The referee has found that this was done for the purpose of increasing the capital of the concern, and not from any necessity existing at the time, growing out of the usual and ordinary course

of the firm's business.  We may add that this finding is in conformity with the testimony of  Holt.   We think that it is quite immaterial whether the discounting of paper by a firm is said to be done for the purpose of increasing its capital or for the purpose of meeting some necessity growing out of the usual and ordinary course of the firm's business. Assuming the note to be  good, such a discounting would not increase the capital of the firm, but would diminish it by the amount of the discount.   Then, as to the necessity of doing it, the fact that the partners did it is the best evidence that it was deemed necessary to do it, in order to increase their stock of ready money ; and we may add that the fact that they took the notes to a broker instead of offering them to a banker in the usual course of business, was a circumstance which a business man would regard as strong evidence that they were in need of money at the time.   The referee has also found that, on July 7, 1880, a note payable to the firm was discounted by this claimant Judlin, with the consent of both partners, realizing for the firm the sum of $98.50, which amount was entered by Holt upon the cash-book of the firm as the amount of the previous discount had been.   The referee also finds that, at still another time, Simmons gave the firm note for $110, for a bill of lumber and reported the fact to Holt, who remonstrated with him for signing a note without the knowledge of him, Holt ; which note was paid at maturity.   The referee also finds on the books of the firm, of date August 21, 1880, an entry of $85, borrowed money, which money was borrowed by Simmons and reported to Holt and which was handed back by Holt to Simmons three days afterwards, to be repaid.   The referee also finds that there was another entry on the books of the firm of $95, borrowed money, $50 of which was borrowed of one Hudson by Simmons without the previous knowledge or consent of Holt, and $10 of which was borrowed of Julian, another claimant, at Holt's suggestion, and repaid on the same day.   The referee

finds that there were no other occasions where money was borrowed on the credit of the firm, or where notes were negotiated in the name of the firm, with the previous consent or subsequent assent of both partners; and that, in every other instance where Simmons borrowed money or negotiated notes in the name of the firm, it was done without the knowledge or consent of Holt, from whom Simmons concealed the fact, Holt not learning of the transactions until after the dissolution of the copartnership and until attempts had been made to collect the sums so borrowed. The testimony of Simmons is quite inconsistent with these findings, and discloses several additional instances where money was borrowed for the firm, one of which was the borrowing of $100 by Holt from Mr. Scruggs. Indeed, the testimony of Simmons would make it appear that the firm was constantly in difficulties about money, continually putting off bills, and that Simmons was frequently driven to the necessity of running from place to place to borrow money, sometimes taking Holt with him. Taking the whole testimony together, and especially the above findings of the referee, we are clear that it does not sustain his conclusion that in order to carry on the business of the firm in the usual and ordinary mode, there was no necessity of borrowing money or of negotiating notes and bills. On the contrary, we regard the testimony as clearly leading to the conclusion that there was such a necessity. This leads us to consider another finding of the referee, which he has placed among his findings of fact, namely, that this firm was not a commercial or trading partnership, within the meaning of .the terms " commercial " or " trading," as applied to partnerships. This finding might be regarded as involving a mixed question of law and fact, if the facts in relation to the character of the firm were in controversy; but as such facts are not here in controversy, we must regard it as no more than a statement of a conclusion of law; and the referee has repeated substantially the same finding among his conclusions of law. Whether this is a sound conclusion has been justly regarded

by the counsel for the opposing parties as the chief question in the case.

The principles which apply in cases like the one stated are entirely settled. Those principles have been nowhere better expressed than by Chief Justice Marshall in the following language: —

" Partnerships for commercial purposes, for trading with the world, for buying and selling from and to a great number of individuals, are necessarily governed by many general principles, which are known to the public, which subserve the purposes of justice, and which society is concerned in sustaining. One of these is that a man who shares in the profits, although his name may not be in the firm, is responsible for all its debts. Another, more appreciable to the subject under consideration, is that a partner (certainly the acting partner) has power to transact the whole business of the firm, whatever that may be, and consequently to bind his partners in such transactions as entirely as himself. This is a general power, essential to the well conducting of business, which is implied in the existence of a partnership. When, then, a partnership is formed for a particular purpose, it is understood to be in itself a grant of power to the acting members of the company to transact its business in the usual way. If that business be to buy and sell, then the individual buys and sells for the company, and every person with whom he trades in the way of business has a right to consider him as the company, whoever may compose it. It is usual to buy and sell on credit; and if it be so the partner who purchases on credit in the name of the firm must bind the firm. This is a general authority held out to the world, to which the world has a right to trust. The articles of copartnership are, perhaps, never published. They are rarely, if ever, seen except by the partners themselves. The stipulations they may contain are to regulate the conduct and rights of the partners as between themselves.

The trading world, with whom the company is in perpetual intercourse, can not individually examine those articles, but must trust to the general powers contained in all partnerships. The acting partners are identified with the company, and have power to conduct its usual business in the usual way. This power is conferred by entering into the partnership, and is, perhaps never to be found in the articles. If it is to be restrained, fair dealing requires that the restriction should be made known. These stipulations may bind the partners, but ought not to affect those to whom they are unknown, and who trust to the general and well established commercial law." *Winship* v. *Bank of U. S.*, 5 Pet. 529, 561.

The difficulties which arise in cases like the one at bar relate to the application of this well understood principle; and here, without going to the trouble of citing cases, it may be said that the decisions of the courts justify the following conclusions: 1. That where the partnership is a trading or commercial partnership, the law implies a power on the part of the active or managing partner to emit, accept, or indorse negotiable paper in the name of the firm. 2. That, although the firm may not be what is known as a commercial or trading partnership, yet if in the transaction of its business it was customary for it to emit, accept, or indorse negotiable paper, the act of an active or managing partner in emitting, accepting, or indorsing such paper in the name of the firm, will bind the firm. 3. That although neither of these conditions exists, yet if a general usage or custom on the part of partnership firms engaged in a like business to emit, accept, or indorse negotiable paper be shown, an implication will arise that an active or managing partner of such a firm has power to bind the firm in this way. 4. And that in all these cases, any person dealing with the firm has a right to assume that such power on the part of an active or managing partner exists, unless he has notice that such power does not exist.

The articles of copartnership of the Simmons Refrigerator Company were silent upon the question of the power of the partners to bind the firm by emitting, accepting, or indorsing negotiable•paper; but it does not follow that, because such power was not conferred by the articles upon the partners, it did not in fact exist; because, according to the principle of commercial law as above stated by Chief Justice Marshall, each partner being an active partner, had impliedly the power to do in the name of the firm whatever was necessary, according to the usual course of business, for carrying on the business of the firm. It may not be really necessary for the purposes of this case to determine whether a manufacturing partnership is a commercial or a trading partnership within the rule which empowers an active partner to bind the firm by emitting, accepting, or indorsing negotiable paper; because in this case it was clearly shown, according to the facts found by the referee, to have been the practice of the firm to do this through the defendant Simmons, who was the active or managing partner. But as observations were made by this court in *Third National Bank* v. *Snyder* (10 Mo. App. 211, 216), which are supposed to give countenance to the doctrine that an active or managing partner of such a firm has no such implied power, we think it proper to express a clear and unequivocal opinion upon this question; because we think that the question is of such importance that the commercial and banking community ought not to feel that the courts have any doubts upon it. What we held in this last case was, that a partner in a firm of brokers, who were mere negotiators, and whose business required neither capital nor credit, had no such implied power. For the purpose of showing how far the courts had gone in denying such implications of power, we also gave a catalogue of several kinds of business in which the courts had held that there was no legal implication of such a power. Among these were milling, publishing, and sugar refining, which are undoubtedly in a

sense manufacturing. But we expressed no opinion whatever except upon the precise question before us.

Whether a manufacturing partnership is to be deemed a trading or commercial partnership within the meaning of this rule, is a question upon which there can be no doubt, if the test laid down by Chief Justice Marshall in the language above quoted is to be considered a correct test. That test is, whether the business of the partnership was to buy and sell; if it was, then, since buying and selling are usually done on credit, an implication of power on the part of one active or managing partner to buy or borrow on the credit of the firm necessarily follows; and since in the ordinary course of commercial transactions, money is raised and debts are acknowledged by the emitting, accepting, or indorsing of commercial paper, an implication of the possession of this power by such a partner equally follows.

That this is the correct view clearly appears from a later decision of the supreme court of the United States than the one above quoted. *Kimbro* v. *Bullitt*, 22 How. (U. S.) 256. In this last case Mr. Justice Clifford, after clearly laying down the general principle of law applicable to the implied power of partners, proceeded to inquire to what kinds of partnerships the implication of power above stated extends; and he concluded by laying down this principle: "Whenever the business, according to the usual mode of conducting it, imports in its nature the necessity of buying and selling, the firm is then properly regarded as a trading partnership, and is invested with all the powers and subject to all the obligations incident to that relation." In the former of these cases ( *Winship* v. *Bank of U. S., supra* ) it was held that the active or managing partner of a partnership whose business was the manufacture of soaps and candles, possessed, by implication of law, such a power; and in the later case (*Kimbro* v. *Bullitt, supra*) the precise question was whether the managing partner of a firm organized for the purpose of forming and operating a steam

saw-mill had such an implied power; and it was held that, although such a partner in a firm organized for the mere purpose of farming would not have such a power, yet the circumstance that the business of the firm included the operating of a steam saw-mill made it a commercial or trading partnership, and raised an implication of such a power. "They were also engaged," said Mr. Justice Clifford, "in running a steam saw-mill for manufacturing purposes; and common observation will warrant the remark that those who engage in that business always want capital to carry it on, and frequently find it necessary to ask for credit. Like those engaged in other branches of manufacture, they buy and sell and have occasion to remit money and collect it from distant places."

Decisions of the supreme court of the United States on questions of commercial law are very high and persuasive authority. The two decisions above quoted from are distinct authority for the proposition that an active or managing partner in a firm whose business is manufacturing has implied power to bind the firm, by emitting, accepting, or indorsing negotiable paper; and this for the reason that buying and selling is necessary to the carrying on of the business of such a firm in the ordinary way. Aside from the authority of the court which has thus twice announced this rule, we are entirely satisfied that the rule is well founded in principle and is universally regarded as the law and acted upon by the commercial community. Indeed, we can see no difference in respect of the necessity of buying and selling, of having capital and of dealing upon credit, between a partnership engaged in general merchandising, and a partnership engaged in manufacturing. The former buys goods and sells them again for a profit either with or without breaking bulk; the latter buys raw materials, changes their character by expending labor and skill upon them and again sells them for a profit. In the latter case equally with the former buying and selling are an essential part of

the business; and we can not understand what difference exists between the two kinds of business in respect of the ordinary mode of conducting them which would furnish a sound basis for implying this power in respect of a partnership of the former kind and denying it in respect of a partnership of the latter kind.

But in the case at bar it was also shown as a fact that money was borrowed for the use of the firm with the consent of both partners; that, with the like consent, commercial paper belonging to the firm had been negotiated, and that, with like consent, notes had been given, executed by Simmons in the same way in which the note in question was executed. Nay, it appeared that such a note had, on a previous occasion, been given to the claimant Judlin for an advance of money used in the firm business, by the consent of both partners. Under these circumstances, it is quite clear that Judlin had a right to assume that such a power on the part of Simmons existed.

At the time when the note in question was executed by Simmons to Judlin, the partnership had expired by limitation and was in fact dissolved; but no pains had been taken by Holt to give the general public any notice of this, or to convey any substantial notice of it to the persons with whom the firm had had dealings, of whom Judlin was one. The case, therefore, stands exactly as though the firm had not been dissolved at the time; and if Holt is obliged to pay a debt contracted by his partner Simmons in fraud of his rights, it must be imputed to his own negligence that he left it in the power of Simmons thus to defraud him. Of course, Judlin would not have advanced his money (or what was in substance the same, his negotiable note) to Simmons for the supposed accommodation of the firm, if he had known or supposed that the firm was in fact dissolved. Judlin having made this advance to Simmons upon a negotiable obligation of the firm and under circumstances which made it the debt of the firm, it was wholly

immaterial, so far as his rights were concerned, whether the money was subsequently applied by Simmons for partnership purposes or for his own private purposes. That was something beyond his control, and with which he had nothing to do.

The only remaining question relates to the validity of the chattel mortgage which was given to secure this four hundred dollar note of Judlin and two notes of Delehanty to the aggregate amount of $662. The well settled rule under this head is, that every partner in ordinary cases, and in the absence of fraud on the part of the purchaser, has a complete *jus disponendi* over all the partnership personalty. He possesses full power and authority to sell, pledge, and otherwise dispose of the entirety or any part of the goods, wares, merchandise, or other personal effects belonging to the firm, and not merely his own share thereof, for purposes within the scope of the partnership. In respect of the shares of his copartners, he is deemed to do such acts as their agent and as the accredited representative of the firm. Each partner is treated without any nicety of discrimination, and is deemed to possess a dominion over the entirety of the property, and therefore clothed with all the ordinary attributes of ownership. Story on Part., sect. 95 ; *Keck* v. *Fisher*, 58 Mo. 532 ; *Clark* v. *Rivers*, 33 Mo. 579. The four hundred dollar note given by Simmons to Judlin, being a valid partnership indebtedness, the mortgage of partnership effects given to secure the same must, in conformity with this principle, be held equally valid. Judlin in his answer does not ask for any relief in respect of this mortgage, but he has gone before the referee with other creditors and proved up his claim, under a general order of the court, and has shown that his claim is a secured claim. In the distribution of the assets in case there should not be enough to pay all the claims, he will therefore be entitled to the preference which his mortgage gives him.

The judgment will be reversed and the cause remanded to the circuit court, with directions to enter a judgment in favor of the claimant Asbury Judlin for the amount of his note, interest and costs, to be paid out of the assets of the partnership in the hands of the receiver, in preference to the other claims, except that of the defendant Delehanty secured by the same mortgage. It is so ordered. All the judges concur.